UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DEVONTE ANDREW EDWARDS,

      Defendant.

_____/

Case No. 1:25-cr-156

Hon. Hala Y. Jarbou
Chief United States District Judge

## DEFENDANT'S SENTENCING MEMORANDUM
## AND BRIEF IN SUPPORT OF MOTION FOR DOWNWARD VARIANCE
## PURSUANT TO 18 U.S.C. § 3553(a)

### INTRODUCTION

Devonte Andrew Edwards is set for sentencing before this Court on April 7, 2026.

In October 2025, a grand jury indicted Mr. Edwards on one count of sexual exploitation of

a minor, in violation of 18 U.S.C. § 2251(a), (e). (ECF 1–2). In December 2025, before

this Court, Mr. Edwards pleaded guilty to the indictment, and this Court accepted the guilty

plea. (ECF 27).

The Probation Office prepared a final Presentence Investigation Report (PSR), to

which Mr. Edwards has one outstanding objection, related to the PSR's application of a

five-point enhancement to his offense level for engaging in a "pattern of activity involving

prohibited sexual conduct." (ECF 35, PSR ¶ 63; *see also id.* pp. 43–44 (Addendum)). The

PSR calculates the guideline range to be 360 months—based on a total offense level of 42,

criminal history category I, and a statutory maximum of 30 years—and it recommends a sentence of 360 months. (*Id.* ¶ 120; *see also id.* p. 45 (Sentencing Recommendation)). If the Court sustains Mr. Edwards's objection, his resulting total offense level would be 37, and his guideline range would be 210–262 months. Mr. Edwards offers the following argument in support of his objection and his request for a below-guideline sentence.

OUTSTANDING OBJECTION TO THE PSR

**1. The PSR Erroneously Adds Five Offense Levels under U.S.S.G. § 4B1.5(b).**

Under U.S.S.G. § 4B1.5(b)(1), a five-point enhancement applies if the government proves by a preponderance of the evidence that the defendant "engaged in a pattern of activity involving prohibited sexual conduct."[1] U.S.S.G. § 4B1.5(b); *United States v. Bowling*, 427 F. App'x 461, 464 (6th Cir. 2011). To show such a pattern, the government must prove that "on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor." U.S.S.G. § 4B1.5, comment. n.4(B)(i) (emphasis added).

Here, the PSR applies the enhancement because Mr. Edwards engaged in "a hands-on sexual offense with [the minor victim] on two occasions." (PSR ¶ 63; *see also id.* p. 44 (Addendum)). But the two sexual encounters with the minor victim, one in March 2025 and one in May 2025, were part of a single criminal episode and thus do not constitute separate occasions for purposes of the enhancement.[2]

---

[1] Mr. Edwards does not contest that the other two criteria for § 4B1.5(b)—that the instant offense of conviction is a covered sex crime and that neither § 4B1.1 nor § 4B1.5(a) applies—are satisfied.

[2] The PSR applies this enhancement solely on the basis that the March and May encounters with the minor victim constituted the requisite two occasions; thus, this memorandum focuses on arguing why those two encounters did not constitute separate occasions. Beyond those two

The term "occasion" has recently received much attention in the context of the Armed Career Criminal Act (ACCA), which imposes a mandatory minimum sentence of 15 years if the defendant has predicate convictions "committed on occasions different from one another." 18 U.S.C. § 924(e)(1). As the Supreme Court has explained, determining whether acts took place on different "occasions" amounts to "identifying episodes of criminal activity." *Wooden v. United States*, 595 U.S. 360, 369 (2022). That inquiry is "multi-factored in nature." *Id.* The relevant factors include:

- *Timing*. "Offenses committed close in time, in an uninterrupted course of conduct, will often count as part of one occasion; not so offenses separated by substantial gaps in time or significant intervening events."

- *Proximity of location*. "[T]he further away crimes take place, the less likely they are components of the same criminal event."

- *Character and relationship of the offenses*. "The more similar or intertwined the conduct giving rise to the offenses—the more, for example, they share a common scheme or purpose—the more apt they are to compose one occasion."

*United States v. Cogdill*, 130 F.4th 523, 528 (6th Cir. 2025) (alteration in original) (quoting *Wooden*, 595 U.S. at 369).

Since *Wooden* set forth this multi-factored approach to identifying "occasions," both the Supreme Court and the Sixth Circuit have since made clear that timing alone is not necessarily dispositive. For instance, in *Erlinger v. United States*, 602 U.S. 821, 826 (2024), the Court considered several burglaries of different businesses that took place "within a span of days" and concluded: "Presented with evidence about the times,

_____

encounters, preponderant evidence does not support any other potential occasions of "prohibited sexual conduct" supporting the enhancement. (*See* R. 34, Defendant's PSR Response, pp. 3–5).

3

locations, purpose, and character of those crimes, a jury might have concluded that some or all occurred on different occasions. Or it might not have done so." *Id.* at 835. Indeed, the Court emphasized that "no particular lapse of time . . . between offenses automatically separates a single occasion from distinct ones." *Id.* at 841. Following *Wooden* and *Erlinger*, the Sixth Circuit has affirmed that a single factor (such as time) does not by itself control. *See, e.g.*, *Cogdill*, 130 F.4th at 530 (rejecting argument that three-month gap necessarily resolved the inquiry); *United States v. Kimbrough*, 138 F.4th 473, 478 (6th Cir. 2025) (holding that jury could reasonably find that burglaries nine days apart and in close proximity to each other took place on a single occasion).

Here, this Court should apply the lessons from *Wooden* and its progeny to interpret the term "occasions" in § 4B1.5's commentary. The inquiries are the same. Both the ACCA and § 4B1.5's commentary require the occasions to be "different" or "separate." *Compare* U.S.S.G. § 4B1.5, comment. n.4(B)(i) ("separate occasions"), *with* 18 U.S.C. § 924(e)(1) ("occasions different from one another"). Indeed, the Second Circuit has already applied *Wooden*'s lessons to interpret the term "instance" in an analogous guidelines provision. *See United States v. Bullock*, 152 F.4th 108, 116-17 (2d Cir. 2025) (applying *Wooden* to § 2G2.2's commentary concerning "two or more separate instances of the sexual abuse or sexual exploitation of a minor"). That § 4B1.5's commentary uses the term "occasions" makes *Wooden* and its progeny even more applicable.

Under *Wooden*'s multi-factored approach, the March and May encounters here took place within the same "episode[] of criminal activity" and thus within one occasion. *See* 595 U.S. at 369. True, the two-and-a-half months between the two encounters (one around

4

March 8, 2025, and the other on May 22, 2025) weighs in favor of separate occasions, but that fact alone is not dispositive. *Cogdill*, 130 F.4th at 530. The remaining factors show that these acts were nearly identical in all other respects. For both "proximity of location" and "character and relationship of the offenses," the two encounters happened in the same place in the same way. Mr. Edwards and the minor victim communicated over Snapchat, Mr. Edwards drove to the minor victim's residence to pick her up, the two returned to Mr. Edwards's residence where the sexual contact occurred, and Mr. Edwards returned the minor victim to her residence. For these reasons, the encounters were "similar or intertwined," and they "share[d] a common scheme or purpose." *Id.* at 529 (alteration in original) (quoting *Wooden*, 595 U.S. at 369).

In response to Mr. Edwards's objection, the PSR states that "Mr. Edwards was aware that the first instance was reported to child protective services and was being investigated. That did not deter him from engaging in sexual contact with the minor a second time." (PSR, p. 44 (Addendum)). Yet that observation only further shows that these two encounters were part of the same criminal episode—the encounters were not separated by an intervening arrest and continued under the same common scheme or purpose. *Cogdill*, 130 F.4th at 526, 529.

Because these two nearly identical encounters "were committed 'during a single criminal episode,'" they did not constitute two separate "occasions." *Kimbrough*, 138 F.4th at 479 (quoting *Erlinger*, 602 U.S. at 835). Thus, they do not support the application of U.S.S.G. § 4B1.5(b)'s pattern enhancement.

Accordingly, Mr. Edwards asks that this Court not apply U.S.S.G. § 4B1.5(b) when calculating his offense level. If the Court sustains the objection, Mr. Edwards's total offense level would be 37. His resulting guideline range, at criminal history category I, would be 210–262 months.

**IMPOSITION OF A SENTENCE**

After calculating the advisory guideline range, this Court "shall consider" the factors listed in 18 U.S.C. § 3553(a) to determine "a sentence sufficient, but not greater than necessary." 18 U.S.C. § 3553(a); *see also Gall v. United States*, 552 U.S. 38, 49–50 (2007). This memorandum discusses each factor in turn.

1. **The nature and circumstances of the offense and the history and characteristics of the defendant.**

A. *Offense Conduct*

Mr. Edwards is convicted of one count of sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(a), (e). On or about March 8, 2025, he connected with the minor victim via Snapchat, a mobile application that requires the use of the Internet. Exchanging chat messages with the minor victim, he knowingly used, persuaded, induced, and enticed the minor victim to engage in sexually explicit conduct. He drove a car to the minor victim's residence and brought the minor victim back to his apartment. There, the two engaged in sexual intercourse, and Mr. Edwards recorded a video depicting the lascivious exhibition of the minor victim's genitals. (PSR ¶¶ 2, 6–11). As discussed above, the two engaged in similar conduct on May 22, 2025 (although it appears that no sexually explicit

6

videos/images were taken during the May encounter).[3] Mr. Edwards accepted responsibility for his actions by pleading guilty.

### B. *History and Characteristics*

#### i.    Background

Mr. Edwards was born on May 17, 1999, in Saginaw, Michigan, to Natacha Edwards and Andrew Sword. Although he knows his father's name, he never met him, and he learned that his father was killed in a vehicle accident in November 2023. Mr. Edwards also grew up with an older brother (Anthony), older sister (Lachey), and younger sister (LaFrance).

Mr. Edwards was raised by his mother in a relationship that was often strained and sometimes abusive. At times, she hit him and screamed at him, and at other times was absent from the home altogether. He spent much of his childhood in low-income neighborhoods and experienced periods of homelessness, staying in shelters with his family. Although he later learned that his mother had been abusing drugs during his childhood, he has no personal recollection of this at the time. He perceived that his mother cared more for his sisters than for him, leaving him with a lasting sense of being unwanted and unloved. Despite these early hardships, his relationship with his mother has since improved, and he reports that she has "apologized for [his] childhood" (PSR ¶ 75). His

---

[3] The PSR lists the videos and images of the minor victim but does not provide dates for those media. (PSR ¶ 17). The indictment charged only a single count of exploitation, taking place "on or about March 8, 2025." (ECF 2, Indictment). And the available evidence shows that only one Snapchat image was recovered from May 22, 2025—"a non-sexually explicit image" of the minor victim and Mr. Edwards. (PSR ¶ 14; *see also* ¶ 12).

mother and sister provided letters in support of Mr. Edwards's character. (Ex. A, Natacha Edwards Letter; Ex. B, LaFrance Edwards Letter).

Relevant to the instant offense, Mr. Edwards also reported memories, to the extent he can recall them, suggesting that he was presexualized as a child. He has an early memory of himself and his sister naked when they were very young, and he believes they may have been sexually abused. When he was in elementary school, older cousins showed him pornographic videos, and he recalls being touched inappropriately by older female cousins and kids in his neighborhood. (PSR ¶ 77).

Against this difficult backdrop, Mr. Edwards demonstrated remarkable resilience. He performed well academically, participated in sports, and cultivated personal interests, such as reading, playing video games, and skateboarding, that provided healthy outlets and a sense of normalcy in a life that was anything but. Seeking greater stability than he had in his mother's home, he moved in with his sister the summer before his senior year, enabling him to graduate high school on schedule in 2017. He reported that throughout his schooling, he was chronically teased and bullied, experiences that had a lasting impact on his self-esteem and confidence. Yet, he persevered, demonstrating responsibility, determination, and a capacity to overcome adversity in hopes to build a somewhat stable life.

Mr. Edwards's resilience is further reflected in his attainment of an associate's degree from Kalamazoo Valley Community College in 2024 and his ability to maintain consistent employment as an adult. (PSR ¶¶ 96, 98–113). At his latest job, which he held for over a year before his incarceration for the instant offense, he worked as a technician

for an office technology company. The owner of the company, Jim Gaugier, provided a letter to the Court, in which he describes Mr. Edwards as an "exemplary employee," who was "dependable, punctual, and consistently willing to go beyond what was required of him." (Ex. C, Jim Gaugier Letter). In Mr. Gaugier's words, Mr. Edwards "has the intelligence, work ethic, and capacity for growth necessary to rebuild his life and become a productive member of society. I firmly believe that with appropriate accountability, structure, and support, he has the ability to learn from this mistake and move forward in a constructive way." (*Id.*).

ii.      Psychological Functioning and Treatment History

Available records and self-reports indicate that Mr. Edwards has experienced significant and progressively worsening psychological distress in the years preceding the instant offense. These concerns were neither recent nor situational; rather, they reflect an established pattern of mental-health difficulties that were recognized but insufficiently treated.

In June 2021, Mr. Edwards reported symptoms of anxiety and interpersonal difficulties during a routine medical visit. (PSR ¶ 84). At that time, he remained employed and was attempting to maintain stability, though early signs of internal distress were already present. By April 2022, his symptoms had escalated to the point of interfering with daily functioning. A concerned individual in his support system encouraged him to seek professional care, suggesting that his struggles were observable to others. (*Id.* ¶ 87).

In June 2022, Mr. Edwards received clinical diagnoses including depression, post-traumatic stress, anxiety, and impaired anger regulation. These conditions are chronic,

interrelated, and known to significantly impact emotional regulation, impulse control, and stress tolerance, particularly in the absence of consistent treatment. (*Id.*)

Despite formal identification of these conditions, the available records indicate that Mr. Edwards did not achieve meaningful stabilization. Documentation from late 2022 through 2023 reflects continued emotional dysregulation, work-related stress, and difficulty managing routine life demands. While structured therapy was recommended on multiple occasions, Mr. Edwards was unable to consistently engage in or sustain treatment. (*See id.*).

His limited follow-through should be understood within the clinical context of his diagnoses. Individuals with trauma-related and anxiety disorders frequently experience avoidance, emotional overwhelm, and shame, all of which can interfere with treatment engagement. As such, his lack of sustained participation in care is more appropriately viewed as a symptom of his conditions rather than a reflection of willful noncompliance.

In the absence of effective treatment, Mr. Edwards reported turning to marijuana as a form of self-medication. (*Id.* ¶¶ 93–94). He described using it to reduce escalating emotional distress and to prevent loss of control. This behavior appears to have been an attempt, albeit maladaptive, to manage symptoms of anxiety, hyperarousal, and anger dysregulation.

Overall, the record supports that, at the time of the offense, Mr. Edwards was experiencing significant, untreated mental health symptoms that likely impaired his emotional regulation, judgment, and ability to cope with stress. These factors are relevant in understanding his behavior and provide important context for the instant offense.

iii.    Potential for Corrigibility and Rehabilitation

Psychotherapist Matthew Rosenberg conducted a clinical interview of Mr. Edwards in which he used two standardized risk assessments to evaluate the risk Mr. Edwards may pose to the community. (*See* Ex. D, Rosenberg Report). On the Rosenberg Historical Risk Assessment, Mr. Edwards scored a "6," indicating a moderate risk for sexual re-offense without therapeutic intervention. (*Id.* at 5). On the Vermont Assessment of Sexual Offender Risk, he scored low-risk for both sexual re-offense (17 points) and violence (15 points). (*Id.*). Based on these results and Mr. Rosenberg's thirty years of experience, Mr. Rosenberg concluded that Mr. Edwards presents a low-to-moderate risk for future sexually abusive behavior. (*Id.* at 6). Factors that weigh in favor of Mr. Edwards's lower recidivism risk include his lack of prior criminal history, lack of prior allegations of sexual misconduct, and lack of history of violence or substance abuse.

As Mr. Rosenberg explains, clinical evaluation indicates that Mr. Edwards does not meet criteria for paraphilic disorders, pedophilic interests, or cognitive distortions. (*Id.* at 6–7). His behaviors appear influenced by early psychosocial vulnerabilities, including childhood abuse, social rejection, and low self-esteem, which contributed to difficulties forming age-appropriate relationships. (*Id.* at 7).

Mr. Rosenberg also explains how treatment and therapy can help Mr. Edwards. (*See id.* at 7–9). And such programs are available to Mr. Edwards within the Bureau of Prisons (BOP). The BOP offers structured sex offender treatment programs (SOTP) that provide cognitive-behavioral therapy, victim empathy development, and education on healthy boundaries and sexual decision-making. Given Mr. Edwards's low-to-moderate risk, lack

of criminal history, and demonstrated remorse, participation in a residential or non-residential SOTP would allow him to address underlying vulnerabilities, increase insight, and acquire skills to prevent future offenses. For instance, Mr. Edwards may benefit greatly from the residential sexual offender program offered at FMC Devens, a 12-to-18-month intensive therapy program.

Mr. Edwards wants to engage in these programs, both to become a mentally healthier person and to demonstrate a proactive commitment to his rehabilitation. He wants to participate in sex-offender treatment, mental-health treatment, and whatever other resources he can use during his time in the BOP to improve his mental health, not reoffend, and live a productive and healthy life. He hopes to deal with his trauma from oversexualization as a child in therapy. And he stated he will also be open and honest with his family if he is struggling with mental health issues in the future. (PSR ¶ 51).

2. **The need for the sentence imposed-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

Mr. Edwards readily admitted guilt for his offense. A sentence below either the PSR's guideline range (360 months) or the resulting range if Mr. Edwards's objection is sustained (210 to 262 months) would not only adequately punish Mr. Edwards but also deter him and others from future criminal conduct. Considering Mr. Edwards's youth and lack of criminal history, any custodial sentence will be significant and meet the four purposes of 18 U.S.C. § 3553(a)(2)—"retribution, deterrence, incapacitation, and

rehabilitation." *Esteras v. United States*, 606 U.S. 185, 191 (2025) (citation omitted). A mandatory minimum sentence of 15 years—which amounts to over half of Mr. Edwards's current lifetime—is more than adequate to provide punishment and protect the public. Further, such a sentence will still give him ample time to address his mental-health issues, engage in sex-offender treatment programs, obtain additional vocational training, and set himself on a more mentally stable, safe, and productive path for his life after prison.

Further, if the Court does not sustain Mr. Edwards's objection to the pattern enhancement, the pattern enhancement adds a tremendous amount of time to Mr. Edwards's guideline range: driving it from 210–262 months (an average of about 20 years) to the statutory maximum of 30 years. In other words, the pattern enhancement effectively adds 10 years to Mr. Edwards's guideline-recommended sentence because he engaged in one additional sexual encounter with the same minor victim. The pattern enhancement is an exceedingly blunt instrument. It treats Mr. Edwards, who engaged in two encounters with the same minor victim, the same as a long-time serial sexual predator who abused more victims over a longer period of time. *Cf. United States v. Fleischer*, 971 F.3d 559, 570 (6th Cir. 2020) (affirming application of five-level pattern enhancement where offender abused two victims over several years).

### 3. The kinds of sentences available.

For custody, the count of conviction carries a mandatory minimum term of imprisonment of 15 years and a maximum term of 30 years. 18 U.S.C. § 2251(a), (e). (*See also* PSR ¶ 119). Guidelines aside, the Court may impose a sentence of 15 years' custody.

13

For supervised release, the count of conviction carries a mandatory minimum term of five years to life. 18 U.S.C. § 3583(k). (*See also* PSR ¶ 123). This Court conducts "an individualized assessment" to determine the length of the supervised-release term, U.S.S.G. 5D1.2(a), ensuring that the length is sufficient but not greater than necessary to address the relevant § 3553(a) factors. Importantly, imposing a term of supervised release is a modified application of § 3553(a), focused only on rehabilitation, deterrence, and public protection—not retribution. 18 U.S.C. § 3583(c); *see also Esteras*, 606 U.S. at 195.

4. **The kinds of sentence and the sentencing range established for the category of offense.**

Mr. Edwards's properly calculated guideline range is 210 to 262 months. The statutory minimum and maximum for the § 2251 offense is 15–30 years.

5. **Any pertinent policy statement.**

The Guidelines' former policy statement on criminal history departures—§ 4A1.3—is pertinent. Although the Guidelines' recent restructuring removed all of the previous departures, "[t]he Commission envisioned and framed this 2025 amendment to be outcome neutral, intending that judges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance." U.S.S.G. Ch. 1, Pt. A. Thus, the Court retains full authority to consider these same circumstances as a basis for variance under 18 U.S.C. § 3553(a). To that end, the U.S. Sentencing Commission compiled the previous departure provisions in Appendix B of the Guideline Manual to serve as a resource for courts.

The Guidelines' previous departure provision under § 5H1.1 is pertinent here. *See* U.S.S.G. App. B, p. 191. That policy provides that a defendant's youthfulness may warrant a downward departure. Mr. Edwards is currently 26 years old. When he committed the offense of conviction in March 2025, he was 25.

The policy statement recognizes several key points about young defendants that apply to Mr. Edwards, such as how brain development continues into the mid-twenties, how young people are more likely to be successfully rehabilitated, and the age-crime curve, which shows that criminal behavior typically decreases significantly as people move through their twenties.

6. **The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Imposing the PSR's recommended sentence of 360 months would result in an unwarranted sentencing disparity. According to the Judiciary Sentencing Information database (JSIN), which provides sentencing data for similarly situated defendants, defendants with a Total Offense Level of 42 and Criminal History Category I often end up with a sentence around 300 months. The relevant information from JSIN provides:

> [D]uring the last five fiscal years (FY2020-2024), there were 241 defendants whose primary guideline was §2G2.1, with a Final Offense Level of 42 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 241 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 299 month(s) and the median length of imprisonment imposed was 300 month(s).

*See* U.S. Sentencing Commission, Judiciary Sentencing Information, https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited 3/24/2026). And as for how

the imposed sentences compared with the guideline ranges, JSIN reports that 62% of defendants in that situation received a downward departure or variance from the guideline range. *Id.*

If this Court sustains Mr. Edwards's objection to the pattern enhancement, then the total offense level would be 37. In that circumstance, JSIN explains that the average sentence was around 200 months. It provides:

> During the last five fiscal years (FY2020-2024), there were 183 defendants whose primary guideline was §2G2.1, with a Final Offense Level of 37 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 183 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 199 month(s) and the median length of imprisonment imposed was 210 month(s).

*Id.* In that circumstance, sentencing courts granted 41% of defendants a downward departure or variance.

Thus, imposing the recommended sentence of 360 months would result in an unwarranted sentencing disparity. A sentence below the properly calculated guideline range is more appropriate.

### 7. The need to provide restitution to any victims of the offense.

Under 18 U.S.C. §§ 2259 and 3663A, Mr. Edwards must pay restitution, but as of the filing of the PSR, no victim impact statement or request for restitution had been received. (PSR ¶ 45).

Additionally, as the PSR discusses, the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 applies. (*Id.* ¶ 46). Thus, in addition to any other penalty, restitution, or special assessment, the Court "shall" impose an assessment of up to $50,000.

16

18 U.S.C. § 2259A(a)(3). In determining the amount of the assessment, the Court shall consider the factors set forth in sections 18 U.S.C. §§ 3553(a) and 3572.

Applying those factors, this Court should impose a minimal assessment. The PSR details Mr. Edwards's financial condition, showing that he has a negative net worth of over $20,000 in student-loan, credit-card, and collection debts. (PSR ¶ 116). Anything beyond a minimal assessment would pose a significant burden to Mr. Edwards, particularly as he tries to re-establish a productive life after a lengthy prison term.

## CONCLUSION

For these reasons, Mr. Edwards asks that the Court sustain his objection to the five-point enhancement, calculate his guideline range at 210–262 months, and sentence him to a below-guideline sentence.

Respectfully submitted,

SEAN R. TILTON
Federal Public Defender

Dated: March 24, 2026

/s/ Eric Fleddermann
ERIC FLEDDERMANN
Assistant Federal Public Defender
50 Louis NW, Suite 300
Grand Rapids, Michigan 49503
(616) 742-7420